

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| PATRICK GHIORSO, <br><br> Plaintiff, <br><br> vs. <br><br> AMERICAN GENERAL LIFE INSURANCE COMPANY, a Texas Corporation, <br><br> Defendant. | CV 16-19-BLG-SPW <br><br> ORDER |

Plaintiff Patrick Ghiorso brings this action against American General Life Insurance Company ("American General") seeking benefits he claims are due under his mother's accidental death plan. The parties filed cross-motions for summary judgment on the question of whether Ghiorso is entitled to benefits under the terms of the plan. For the reasons set forth below, American General's motion for summary judgment is granted and Ghiorso's motion for summary judgment is denied.

I.  **Background**

In July 2012, Plaintiff Patrick Ghiorso's mother, Julia Rushing-Ghiorso, died of a mixed drug overdose at her home in Glendive, Montana. (Doc. 17 at ¶ 1;

1

Doc. 28 at ¶ 1). Prior to her death, Julia suffered from a history of sleep apnea, back surgery and diabetes. (Doc. 28 at ¶ 11). She took "innumerable" medications as a result. (*Id.*). According to the post-mortem examination, it was a reaction between two, some, or all of these prescription drugs that caused her death. (Doc. 21 at ¶ 8). Julia's death certificate indicates that her death was an "[a]ccident," (Doc. 21 at ¶ 4), "[d]ue to misapplication of prescribed Medication for a recent backsurgery (sic) per toxicology report[.]." (Doc. 28 at ¶ 4). In his Report of Postmortem Examination, Dr. Thomas Bennett reported detecting the following drugs in Julia's system at the time of her death: nicotine, cotinine, caffeine, diazepam, nordiazepam (sic), trimethoprim, zolpidem, gabapentin, cyclobenzaprine, promethazine, quetiapine metabolite, morphine (free), morphine glucuronide, hydromorphone, and hydromorphone glucuronide. (Doc. 28 at ¶ 9).

Prior to her death, Julia obtained an accidental death and dismemberment insurance policy from American General. The policy has a $250,000 death benefit and was in effect at the time of Julia's death. (Doc. 21 at ¶ 2). After Julia's death, in December 2012, Ghiorso made a claim for policy benefits as the sole beneficiary. (*Id.* at ¶ 11). On May 8, 2013, American General informed Ghiorso that the policy did not cover Julia's death. (Doc. 21-4). American General explained that because medication was the whole contributing cause of Julia's loss, her death did not meet the definition of an Accidental Injury under the policy. (*Id.*

at 1). On March 3, 2016, Ghiorso filed a complaint for declaratory judgment against American General asking this Court to review the terms of the insurance policy and declare that American General was required to pay the death benefit. (Doc. 1).

## II. Legal Standard

### A. Summary Judgment

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). There must be a genuine dispute as to any material fact, which is a fact "that may affect the outcome of the case." *Id.* at 248.

When cross-motions for summary judgment are filed, the Court must evaluate each motion separately, giving the non-moving party in each instance the

benefit of all reasonable inferences. *ACLU v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003), *cert. denied* 540 U.S. 1110 (2004). The filing of cross-motions for summary judgment, where both parties argue there are no material factual disputes, does not diminish the court's responsibility to determine whether disputes as to material fact are present. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## B. Insurance Contract Law

The interpretation of insurance contracts is a question of law in Montana. *Marie Deonier & Assoc. v. Paul Revere Life Ins. Co.*, 9 P.3d 622, 630 (Mont. 2000). The language of the insurance policy governs if it is clear and explicit. *Id.* at 630. The court must "accord the usual meaning of the terms and words in an insurance contract" and "construe them using common sense." *Modroo v. Nationwide Mut. Fire Ins. Co.*, 191 P.3d 389, 396 (Mont. 2008). In interpreting an insurance contract, the court "will read the insurance policy as a whole, and will if possible, reconcile its various parts to give each meaning and effect." *Farmers Alliance Mut. Ins. Co. v. Holeman*, 961 P.2d 114, 119 (Mont.1998).

An insurance contract is ambiguous if it is "'reasonably subject to two different interpretations.'" *Modroo*, 191 P.3d at 396 (quoting *Mitchell v. State Farm Ins. Co.*, 68 P.3d 703 (Mont. 2003)). Whether a provision of an insurance contract is "reasonably susceptible to two different interpretations," is determined

4

from "the viewpoint of a consumer with average intelligence, but untrained in the law or the insurance business." *Id.* However, a provision is not ambiguous "just because a claimant says so or just because the parties disagree as to [its] meaning. . ." *Giacomelli v. Scottsdale Ins. Co.*, 221 P.3d 666, 667 (Mont. 2009) (internal citations omitted). Ordinarily, "[a]ny ambiguity in an insurance policy must be construed in favor of the insured and in favor of extending coverage." *Hardy v. Progressive Specialty Ins. Co.*, 67 P.3d 892, 896 (Mont. 2003).

### III. Discussion

The parties agree that Julia died from a mixed drug overdose. They also agree that she was taking the drugs as prescribed for various medical conditions, including sleep apnea and diabetes. (Doc. 21-3 at 6). American General argues that summary judgment is appropriate and coverage was appropriately denied because the policy definition of "accidental injury" specifically states that loss resulting from medication is not an "accidental injury."

Ghiorso argues that coverage exists for three reasons. First, Ghiorso argues that Julia's death is presumed accidental under Montana law so Montana law does not allow American General to exclude coverage for Julia's death. Second, he argues that the limiting language in the "accidental injury" definition must be construed as an exclusion, which creates an ambiguity in light of the prescription drug exclusion contained elsewhere in the policy, so American General cannot

5

show his claim is excluded. Third, Ghiorso argues that the policy is considered "disability insurance" under Montana statutory law, and American General cannot show coverage is excluded under the statutes. The Court addresses these arguments in turn.

A. Coverage

An insured bears the initial burden to establish that a claim falls within the basic scope of the insurance coverage. *Travelers Cas. and Sur. Co. v. Ribi Immunochem Research, Inc.*, 108 P.3d 469, 476 (Mont. 2005). Once the insured meets this initial burden, the insurer has the burden of proving the applicability of an exclusionary clause. *Id.* Thus, before any exclusion becomes relevant, Ghiorso must establish that coverage exists.

1. Does coverage exist because Julia's death is presumed accidental under Montana law?

As an initial matter, Ghiorso argues that Montana law presumes Julia's death was accidental so coverage exists notwithstanding the policy language. (Doc. 20 at 11). Relying on *Schroeder v. Metro. Life Ins. Co.*, 63 P.2d 1016, 1021 (Mont 1936), Ghiorso suggests that Julia's death certificate, which designates the manner of her death as an "accident," is *prima facie* evidence of his entitlement to policy benefits. (Doc. 20 at 18). The Court disagrees.

In *Schroeder*, the insured died of a heart attack. 63 P.2d at 1018-19. The question before the court was whether she knew she suffered from heart disease

6

when she acquired her life insurance (which would have precluded benefits). *Id.* In order to obtain benefits, the insured's estate had submitted a proof of death, accompanied by a "physician's statement." *Id.* The physician's statement reported that the insured's cause of death was, in part, "chronic myocarditis," or heart disease, that the insured had suffered from "chronic disease" and that the doctor had treated her two months prior to her death. *Id.* The *Schroeder* court held that when the beneficiary submits a proof of death (including the physician's statement), the beneficiary adopts the statements made by the physician, and those statements are sufficient to make a prima facie case against the beneficiary. *Id.* at 1021. In other words, the physician's statements were prima facie evidence that the insured knew she suffered from heart disease when she applied for life insurance, in violation of her warranty that she was in sound health. *Id.* at 1020. Contrary to Ghiorso's implication, the *Schroeder* court did not use a death certificate to conclusively define a policy term. The court used the death certificate to find facts.

While *Schroder* may stand for the proposition that Julia's death certificate is prima facie evidence on the facts of her death (e.g., it was accidental as opposed to intentional), it does not stand for the broad proposition that death certificates dictate the existence of insurance coverage. Whether Julia's death occurred accidentally is an entirely different question than whether she sustained an

"accidental injury" under the terms of the insurance policy. In order for the court to decide whether Julia died of an "accidental injury," the court must interpret and apply the policy terms as a matter of law. *Newbury v. State Farm Fire & Cas. Ins. Co. of Bloomington, Ill.*, 184 P.3d 1021, 1024 (Mont. 2008). Thus, the Court will turn to the policy language.

## 2. Does coverage exist under the plain language of the policy?

American General's policy provides that it will "pay the accidental death benefit shown in the Policy Schedule if the Insured Person dies as a result of an Accidental Injury." (Doc. 21-1 at 5). In the policy definitions, "accidental injury" is defined as "accidental bodily injury, which is unforeseen and suddenly sustained without design or intent of an Insured Person that:

(a) is not caused or contributed to, directly or indirectly, by a disease, bodily or mental infirmity, illness, infection, medicine or surgery used to treat an Insured Person, or any other cause or physical condition [...]

(*Id.* at 4) (hereinafter the "medicine clause").

The plain language of the medicine clause makes clear that bodily injury caused or contributed to by medicine is not an "accidental injury." (*Id.*). Ghiorso agrees that Julia died from a misapplication of prescription drugs. (Doc. 19 at 1). Typically, the language of an insurance policy governs if it is clear and explicit. *Marie Deonier & Assoc.*, 9 P.3d at 630. So, under the plain language of the policy, Julia's death was not an "accidental injury" and is not covered.

8

Ghiorso argues, however, that the medicine clause in the initial coverage grant is actually an exclusion, which, when read in conjunction with the drug exclusion, creates a policy ambiguity that must be construed in his favor. (Doc. 20 at 8). Relying on Second and Third Circuit Court decisions, Ghiorso argues that the medicine clause must be construed as an exclusion, regardless of its placement in the initial coverage grant, because the exclusionary effect of the policy language, not its placement, controls. (*Id.* at 10) (quoting *Stonewall Ins. Co. v. Asbestos Claims Mgt. Corp.*, 73 F.3d 1178, 1205 (2d Cir. 1995) and *Borough of Moosic v. Darwin Nat. Assur. Co.*, 556 Fed. Appx. 92, 97 (3d Cir. 2014)). Assuming, without deciding, that this is true, and coverage exists initially, the policy exclusions still ultimately operate to bar coverage.

### 3. Exclusions

The policy includes the following drug exclusion:

> We will pay NO benefits for any Accidental Injury or any loss caused or resulting in whole or in part by the following:
>
> . . .
>
> (b) the Insured Person's being under the influence of an excitant, depressant, hallucinogen, narcotic; or any other drug or intoxicant including those prescribed by a Physician that are misused by the Insured Person[.]

(Doc. 21-1). Ghiorso argues that the medicine clause cannot apply to prescription drugs because it, combined with the drug exclusion, creates a policy ambiguity

9

with regard to ongoing medical treatment involving the use of prescribed narcotic medication. The Court disagrees.

The touchstone in determining whether ambiguity exists in an insurance policy is whether the relevant portion is "'reasonably subject to two different interpretations.'" *Modroo,* 191 P.3d at 396. As noted above, this determination is made from "the viewpoint of a consumer with average intelligence, but untrained in the law or the insurance business." *Id.*

Ghiorso first contends that the term "medicine" makes the medical clause exclusion ambiguous. (Doc. 20 at 15). But giving the terms and words used in the policy their usual meaning, and construing those terms and words using common sense, the Court finds that the word "medicine" is not ambiguous. A consumer with average intelligence, not trained in the law or insurance business, would think that "medicine" includes prescription drugs.

Ghiorso also argues that because the medicine exclusion does not specifically mention prescription drugs, but the drug exclusion does, a reasonable interpretation of the policy is that the medical exclusion does not apply to prescription drugs. (*Id.* at 16). Otherwise, Ghiorso argues, it would render the drug exclusion "mere surplusage." (*Id.*). Consequently, Ghiorso argues that when the policy as a whole is considered, an ambiguity exists regarding whether an accidental death resulting from the use of a narcotic actually prescribed by a

10

physician requires the insurance provider to pay accidental death benefits. (*Id.*).
In support of his argument, Ghiorso points the Court to a number of cases interpreting policies containing both medical treatment exclusions and prescription drug exclusions. But what Ghiorso fails to notice is the distinction between the prescription drug exclusions in those cases versus the drug exclusion in this case.

In the cases on which Ghiorso relies, the prescription drug exclusion excluded loss resulting from injury sustained while taking prescription drugs, unless the drugs were taken as prescribed or administered by a physician. *See O'Daniel v. Hartford Life Ins. Co.*, 2014 WL 3970081 (D.S.D. Aug. 13, 2014) ("injury resulting from voluntarily taking drugs which federal law prohibits dispensing without a prescription . . . unless the drug is taken as prescribed or administered by a licensed physician."); *Ramsey v. Hartford Life Ins. Co.*, 2013 WL 1693673 *2 (D. Idaho April 17, 2013) ("injury sustained while voluntarily taking illegal or non-prescribed drugs, unless the drug is taken as prescribed or administered by a licensed physician"); *Smith v. Stonebridge Life Ins. Co.*, 582 F.Supp.2d 1209 (N.D. Cal 2008) ("[injury] caused by or result[ing] from the Covered Person's taking or using any narcotic, barbiturate or any other drug, unless taken or used as prescribed by a Physician); *Edwards v. Monumental Life Ins. Co.*, 812 F.Supp.2d 1263, 1267-68 (D. Kan. 2011) ("[Loss caused by] sickness

11

or its medical or surgical treatment, including diagnosis, taking of any drug, medication, narcotic, or hallucinogen, unless as prescribed by a Physician).

In contrast, the drug exclusion at issue in this case excludes any loss sustained by, "the Insured Person's being under the influence of an excitant, depressant, hallucinogen, narcotic; or any other drug or intoxicant including those prescribed by a Physician *that are misused by the Insured Person*[.]" (Doc. 21-1) (emphasis added). In other words, the drug exclusion applies to injuries that occur to an Insured as a result of being under the influence, including those injuries that occur if a person abuses their prescription drugs.[1] It carves out those particular prescription drugs that may be prescribed by a physician, but are not being used in the manner prescribed.

Looking at the policy as a whole, the only reasonable interpretation of the two exclusions is to exclude coverage where an insured's injury resulted from being under the influence of illegal drugs or by taking prescription drugs not as prescribed. This provision is not inconsistent with the medicine exclusion involving accidental death resulting from taking narcotics prescribed by a

---

[1] This distinction is also what allows the drug exclusion clause to exist without offending Montana insurance statutes regarding favorable language. (*See* Doc. 20 at 19-23). The case Plaintiff relies on for his statutory argument, *Hummel v. Contl. Cas. Ins. Co.*, 254 F.Supp.2d 1183 (D. Nev. 2003), has the same policy language regarding prescription drugs as the other distinguishable cases he cites. The language in American General's policy is different and not less favorable than the Montana statute. Moreover, American General points out that this policy is considered "miscellaneous insurance," not disability insurance. The Court agrees.

12

physician as part of medical treatment for sickness or disease. That is, when medical treatment includes taking prescribed narcotics, as in this case, the medical treatment exclusion applies without respect to the use of the prescribed narcotics. The drug exclusion for non-prescribed narcotic use or abused prescription drugs is simply inapplicable.

Applying the policy to Julia's situation results in no coverage. It is undisputed that Julia was receiving ongoing medical treatment at the time of her death. This treatment included the use of prescription medication to address her pain, depression, and diabetes. Consequently, her accidental death, which resulted from a mixed drug overdose resulting from ongoing medical treatment for those ailments, is expressly excluded by the unambiguous language of the policy.

## III. Conclusion

For the above stated reasons, the Court GRANTS Defendant's motion for summary judgment (Doc. 13), and DENIES Plaintiff's motion for summary judgment (Doc. 19).

DATED this 27th day of October, 2016.

SUSAN P. WATTERS
United States District Judge